# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| COQUICO, INC. | : |
| DEBTOR(S) | : BANKRUPTCY NO.  13-16049 SR |

# OPINION

BY:  STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

The above Chapter 7 Bankruptcy case was filed on July 9, 2013. It was

dismissed with prejudice on January 14, 2014. Dismissal followed a two day evidentiary

hearing brought on by the Motion ("Dismissal Motion") of creditor Angel E. Rodriquez

Miranda ("Rodriquez"). The Dismissal Motion was filed on September 27, 2013. The

hearings took place on December 2, 2013 and January 13, 2014. The Court's findings

of fact and conclusions of law were issued orally at the conclusion of the second

hearing day and are incorporated herein by reference.[1] As a part of its ruling granting

the Dismissal Motion, the Court retained jurisdiction to consider the imposition of

sanctions as might be appropriate under the circumstances. A Motion seeking sanctions

("Sanctions Motion") was filed by Rodriquez on January 22, 2014. It seeks monetary

sanctions against the Debtor, Coquico, Inc. ("Coquico"), the principal of the Debtor,

Malik Benin ("Benin") counsel for the Debtor, Kahiga A. Tiagha, Esquire ("Tiagha") and

counsel's law firm, Tiagha & Associates. Coquico made no response to the Sanctions

---

[1] The Court's ruling has been transcribed, as were all proceedings from the first day of the hearing. Proceedings from day two of the hearing, other than the ruling, have not been transcribed as of this writing.

Motion, but answers in opposition were filed on behalf of Benin and Tiagha. An evidentiary hearing on the Sanctions Motion was held February 26, 2014. For the reasons discussed below, the Sanctions Motion will be granted, in part; which is to say that monetary sanctions will be imposed on the Respondents, but in an amount less than requested.

*Background*

Coquico's troubles date back many years. The collective pleadings, exhibits, testimony and legal memoranda from the dismissal and sanctions hearings recount the relevant history in abundant detail. As that history is rather extensive, and as there are no uninitiated parties, the Court will confine its recital to that which it deems necessary for clarity and to address the issues for which jurisdiction over the now dismissed case has been retained.

Coquico is a Pennsylvania Corporation with a registered office in Wayne, Pennsylvania.[2] Benin is its principal shareholder. Rodriquez claims to have a stockholder interest, but that is disputed.

The company was formed in 1999 to sell stuffed animal type toys and related products (collectively the "Plush Toys") at souvenir outlets in Puerto Rico. Benin designed the Plush Toys which are apparently susceptible to copyright and trademark protection due to possessing certain unique attributes, including the fact that some of the replicas are of species indigenous to Puerto Rico.

---

[2] It appears that this was a "drop-box" office and that the Company's business activities took place in Puerto Rico.

It appears that the company was profitable in its early days but suffered financial setbacks after a few years. Rodriquez was employed by Coquico and earned wages and commissions for selling the Plush Toys. He also loaned monies to the Company. In 2005 Rodriquez quit over non-payment of earnings and loans.

Rodriquez thereafter proceeded to file a collection action in the San Juan Superior Court. Rodriquez claims that in 2007, as "retaliation" for his lawsuit, Benin instituted a copyright infringement action against him in the United States District Court for the District of Puerto Rico. ("Infringement Action")

Whether the Infringement Action was retaliatory or not, its outcome was favorable to Coquico. An injunction issued against Rodriquez based on Benin's claims that for years Rodriquez had been secretly selling merchandise identical to the Plush Toys through a separate company. Rodriquez did not necessarily deny the conduct, but argued that the Plush Toys were not copyrightable. This "defense" was rejected by the District Court, and later, in 2009, by the United States Court of Appeals for the First Circuit.

The Circuit Court remanded the Infringement Action to the Puerto Rico District Court for a determination of damages. At that juncture Coquico had the option of presenting evidence of actual damages, or electing to have the Court award statutory damages. Coquico chose the latter option, and in an Opinion and Order dated August 19, 2010, the District Court awarded Coquico damages in the amount of $15,000.00.

Rodriquez, in the meantime, had discontinued his Superior Court collection action. In June 2010 he refiled it in the Puerto Rico federal Court, adding to the lawsuit at that time allegations of defamation and a claim for damages incident thereto.

3

Evidence established that about two years prior to that Benin had formed a company called 18 Degrees North, LLC, and then systematically transferred the business and assets of Coquico to the new company. Thus, 18 Degrees North was selling the Plush Toys in Puerto Rico in much the same manner as Coquico had done as early as 2009/2010, and continuing through the time of the Dismissal hearing.

The outcome of the collection/defamation lawsuit, meanwhile, had proved favorable to Rodriquez. On July 28, 2011 a judgment in the amount of $348,821.23 was entered in his favor and against Coquico. In September 2011, acting on the judgment, Rodriquez obtained a writ of execution against Coquico's assets. Despite having done so, by August 2012 Rodriquez had been unable to collect on the judgment. He thereupon petitioned the District Court to approve a U.S. Marshall's public auction of Coquico's intellectual property assets (i.e., the copyright and trademarks associated with the Plush Toys). On September 11, 2012 the District Court granted that Motion and a public auction of the assets was scheduled for July 11, 2013.

On July 8, 2013, Coquico, Benin and Benin's wife, Phillipa Ashby, filed a Motion asking the Puerto Rico District Court to vacate its Order authorizing the public auction. As cause they asserted inadequate notice, and claimed for the first time that the intellectual property assets actually were the property of Benin's mother, Ms. Acquanetta Benin. Ms Benin, they argued, was an indispensable party who had theretofore been excluded from the proceedings. Simultaneously, a petition was filed on behalf of Ms. Benin in the Puerto Rico District Court requesting permission to intervene in the Rodriquez lawsuit.

4

Both the Motion to vacate and the petition to intervene asserted that the copyrights and trademarks at issue had been sold by Coquico to Ms. Benin in 2006. The Respondents herein claim that the intellectual property "rights" were thereafter licensed by her, to Coquico at first, and later to 18 Degrees North. Of significance, 2006 was shown to be the first occasion in both of the lengthy Puerto Rico litigations that anyone had ever claimed that Coquico was not the legal owner of the intellectual property assets.[3] To the contrary, the evidence adduced at the dismissal hearing established beyond peradventure that Coquico and Benin had consistently asserted the exact opposite.

The Motion to Vacate and the Petition to Intervene were both purportedly filed "*pro se;*" however, the Respondents  acknowledge that they were in fact prepared by Tiagha and mailed for filing from his law office in Philadelphia. By Order dated July 10, 2013 the Puerto Rico District Court summarily denied both the Motion to Vacate and the Petition to Intervene, clearing the way for the impending public auction. As noted above, however, Coquico had filed its Chapter 7 case in this District one day earlier, and the scheduled public auction did not take place.


*Discussion*

A) Legal Theories

The Movant, Rodriquez, seeks monetary sanctions in an amount equal to the attorney's fees and costs incurred by him in connection with the Dismissal Motion. The total sum is approximately $85,000 and represents, for the most part, the attorney's fees

---

[3] On January 10, 2014, in furtherance of this position, Ms.Benin filed an adversary proceeding in Coquico's bankruptcy case against Rodriguez and the Chapter 7 Trustee, seeking declaratory and other relief. The adversary proceeding was dismissed along with dismissal of the main case.

of his Puerto Rico and Philadelphia counsel. Rodriguez asserts three alternate legal

bases in support of his Motion: first, Federal Rule of Bankruptcy Procedure 9011;

second, the courts' power to sanction misconduct under 11 U.S.C. § 105(a); and third,

28 U.S.C. § 1927. The Court will address each in turn:

> (i)   _Bankruptcy Rule 9011_

Bankruptcy Rule of Procedure 9011, provides in pertinent part:

> **Rule 9011. Signing of Papers; Representations to the Court; Sanctions; Verification and Copies of Papers**
>
> (a) Signature
>
> Every petition, pleading, written motion, and other paper, except a list, schedule, or statement, or amendments thereto, shall be signed by at least one attorney of record in the attorney's individual name. A party who is not represented by an attorney shall sign all papers. Each paper shall state the signer's address and telephone number, if any. An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.
>
> (b) Representations to the court
>
> By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
>
> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
>
> (c) Sanctions
>
> If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the

attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How initiated

(A) By motion

A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

(B) On court's initiative

On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

(2) Nature of sanction; limitations

A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

**(A)** Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

**(B)** Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.

(3) Order

When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.

The principal purpose of F.R.B.P. 9011 is to deter litigation abuses. It has been

held also that under appropriate circumstances compensation to the party injured by the violation is an acceptable means by which to achieve this end. *Doering v. Union Bd. of Chosen Freeholders,* 857 F.2d 191, 194 (3d Cir. 1988).[4] The decision to impose sanctions is based on an objective standard of reasonableness under the circumstances. *In re Taylor,* 655 F.3d 274, 282 (3d Cir. 2011). Before consideration of the conduct in question against the applicable legal standard, the Court first takes up a threshold question of untimeliness which Tiagha and Benin assert to be largely if not wholly dispositive.

Both of the Respondents assert that the Court cannot impose sanctions against them because Rodriquez did not comply with the "safe harbor" provision of Rule 9011. The safe harbor provision requires 21 days advance written notice of the intent to seek sanctions so that a party alleged to have committed an act warranting the imposition of sanctions can act to remedy the situation. The Respondents both acknowledge that the 21 day safe harbor provision, by express language of the Rule, does not apply if the conduct alleged is the filing of a bankruptcy petition in violation of F.R.B.P. 9011(b), but both argue that it is still essentially fatal to the Sanctions Motion. Specifically, Benin and Tiagha assert that neither of them was provided with 21 days advance written notice of an intent to seek sanctions against them personally. Benin claims that this is entirely conclusive as to him, while Tiagha argues that as to him the only possible sanctionable conduct is the filing of the bankruptcy petition itself. Benin adopts the latter argument as his fallback position. The Court disagrees.

All signatories to a bankruptcy petition, including Bankruptcy counsel and a

---

[4] Although this case was brought under F.R.C.P. 11, the Third Circuit has explained that cases decided pursuant to F.R.C.P. 11 apply to B.R. 9011. *In re Gioioso,* 979 F.2d 956, 960 (3d Cir. 1992).

debtor's officer or representative, subject themselves to Bankruptcy Rule 9011.[5] Benin,

therefore, is not as fully insulated as he would have it. As noted though, both Benin and

Tiagha also argue that, to the extent the safe harbor does not fully protect them,

sanctions are limited to the filing of the Bankruptcy petition alone. The Respondents

seem to imply that filing the petition was practically a ministerial act, which would call for

at most nominal monetary sanctions. Put differently, they argue that no conduct after

the filing of the Bankruptcy petition exposes them to sanctions under Rule 9011; once

more, because of the Movant's alleged safe harbor violation. The Court, again,

disagrees.

 As the timing of a sanctions motion is often central to its viability, the Court, at the

outset, takes note of an additional time constraint having to do with a request for Rule

9011 sanctions. It was recently implicated in a case before this District's Chief

Bankruptcy Judge Eric Frank. The Court incorporates the relevant discussion from the

Opinion in *Theokary v. Shay, et al., (In re Theokary)*, 2012 WL 3717967 (Bkrtcy.E.D.Pa.

Aug. 22, 2012):

> More than twenty (20) years ago, in *Pensiero,* the Court of
> Appeals announced a supervisory rule requiring that all
> motions for sanctions under Fed.R.Civ.P. 11 be filed before
> the entry of final judgment. The purpose of the supervisory
> rule is to conserve judicial resources by maximizing the
> likelihood that an appeal of a Rule 11 decision may be
> resolved at the same time as any appeal on the merits. The

---

[5] Although there is some case law to the contrary, decisional authority in this District is clear that
sanctions may be imposed upon a corporation's officers in appropriate circumstances. *See Project 74
Allentown, Inc. v. Frost*, 143 F.R.D. 77, 83 n.7 (1992), *aff'd* 998 F.2d 1004 (3d Cir. 1993) (explaining that
because Rule 11 duties are personal and non-delegable, Rule 11 permits a court to sanction an individual
who signed a paper on behalf of a corporation as well as the corporation itself). *See also In re Jazz Photo
Corp.*, 312 B.R. 524, 535 (Bankr. D.N.J. 2004) (stating that a court can sanction a represented party
under Rule 11 who had "direct, personal involvement" in the decisions at issue and also citing *Project 74
Allentown* for the proposition that an individual who signed a paper for a corporation can be sanctioned in
addition to the corporation itself).

supervisory rule is intended to "eliminat[e] piecemeal appeals and avoid[ ] scenarios in which two separate appellate panels are forced to acquaint themselves with the pertinent facts and the parties' respective positions." *In re Tobacco Road Associates, LP,* 2007 WL 966507, at *22 (E.D.Pa. Mar. 30, 2007)

Although the Court of Appeals has not stated so expressly in a precedential decision, courts in this circuit have held that the Rule 11 supervisory rule applies when Rule 9011 sanctions are sought in bankruptcy proceedings. *See, e.g., In re Nicola,* 65 F. App'x 759, 762 (3d Cir.2003) (nonprecedential); *see also Schaefer Salt,* 542 F.3d at 98 (collecting cases). I will follow the existing precedent in this regard.

Since its adoption, the supervisory rule has been both expanded and restricted. The Court of Appeals has applied the supervisory rule to a district court's *sua sponte* imposition of Rule 11 sanctions, *see Simmerman v. Corino,* 27 F.3d 58 (3d Cir.1994), and the imposition of sanctions under the court's inherent power, *see Prosser v. Prosser,* 186 F.3d 403 (3d Cir.1999). More recently, however, the Court declined to extend the supervisory rule to sanctions imposed under 28 U.S.C. § 1927. *See Schaefer Salt,* 542 F.3d at 102. Whether *Schaefer Salt* is a precursor to further contraction of the *Pensiero* supervisory rule is not for this court to say. Unless and until the Court of Appeals directs otherwise, this court is bound to apply the supervisory rule.

A mechanical application of the supervisory rule would mandate denial of the Motion for Sanctions because it was filed: (a) seventeen (17) months after the court's February 15, 2011 order entering judgment in favor of the remaining Defendants (if that was a final order, *but see Theokary,* 444 B.R. at 310 n. 6) and (b) three (3) months after the April 10, 2012 order entering judgment against the remaining Defendants.

The supervisory rule, however, may not be so rigid. For example, in *In re Brown,* 1998 WL 848102, at *4–5 (E.D.Pa. Dec. 4, 1998), the district court affirmed the bankruptcy court's grant of a Rule 11 motion filed three (3) weeks after

10

the entry of the final judgment. The court reasoned that, in the particular circumstances of that case, the movant's discovery of the Rule 11 violation was so close in time to the entry of judgment that the filing of the motion was sufficiently prompt as to warrant the relaxation of the supervisory rule. *Accord Project 74 Allentown, Inc. v. Forst,* 143 F.R.D. 77, 85–87 (E.D.Pa.1992).

As the court stated in *Tobacco Road,* the supervisory rule is a guide for litigants filing Rule 11 motions for sanctions, generally requiring them to do so as early as practicable, but *not* necessarily establish[ing] a *per se* test for promptness that requires dismissal for noncompliance under all circumstances. While the rule provides the courts in the Third Circuit with the discretion to avoid consideration of Rule 11 motions filed after final judgment is entered in order to promote judicial economy, it also appears to leave the courts with some discretion in deciding when it is practicable to file a Sanctions Motion. 2007 WL 966507, at *22 (footnotes and quotation marks omitted)

*Theokary,* 2013 WL 3717967, at *2, n. 4.

In *Theokary*, the Court found the Sanctions Motion before it to be untimely, even under what it described as the "relaxed" standard articulated in the *Tobacco Road* case. In *Theokary*, however, the sanctions movants had waited at least 17 months before filing their motion. This case stands in stark contrast. The Movant here put all parties on notice from the outset of an intent to request sanctions should the bankruptcy case be dismissed for cause. In this regard the final paragraph of the Dismissal Motion (¶ 111) recites:

111. Rodriguez reserves all of his rights to seek an award of sanctions under Fed.R.Bankr.P. 9011 in the event the Court dismisses the Debtor's bankruptcy case for cause including lack of good faith. *See In re 15375 Memorial Corp.*, 430 B.R. 142 (Bankr. D.Del. 2010). Rodriguez further requests that, in the event the Court grants the relief sought herein, the Court retain jurisdiction to permit Rodriguez to make such a request and to ensure that there are no issues regarding

11

> timeliness under the Third Circuit's supervisory rule
> regarding post dismissal jurisdiction to sanction. *Id.* (citing
> *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90 (3d
> Cir. 1988)).

The Dismissal Motion was filed not long after the case was commenced.[6] Moreover, in this case a motion for sanctions was specifically discussed at the conclusion of the Dismissal Motion hearing, the Court expressly retained jurisdiction to consider it, the Sanctions Motion itself was filed 9 days later, the Sanctions Motion hearing was commenced and concluded in one afternoon approximately one month later, and there has been no appeal of the Dismissal of the bankruptcy case.

None of the purposes for which the supervisory rule exists would be served by dismissal of the Sanctions Motion. Indeed, it would not only require an extremely rigid application of the supervisory rule to compel dismissal of the Motion, but it would also serve to undercut the prophylactic purposes for which Rule 9011 exists in the first place. This is particularly so where the Sanctions Motion, as here, is predicated on the assertion that the bankruptcy case should be dismissed for being commenced in bad faith and for an improper purpose, where that was literally the only issue in the entire case, where a vigorous defense was interposed, and where the pertinent confirming decision came only after a two day evidentiary hearing. In these particular circumstances, the Court finds that the timing of the Sanctions Motion comports with the supervisory rule.

As noted, however, Benin and Tiagha still argue that the conduct subject to the requested monetary sanction is severely circumscribed by the safe harbor provision, because 1) the filing of the Bankruptcy Petition is the only potentially sanctionable act,

---

[6] Indeed, in his Memoranda of law, Tiagha describes the Dismissal Motion as having been filed "immediately" after the bankruptcy filing. (Tiagha Brief at 13)

and 2) the legal fees and costs at issue all postdate the filing of the Bankruptcy Petition.
The Court rejects this thesis.

The Court will hereinafter review particulars of the Respondents' conduct;
however, it should be noted at the outset that the obligations imposed by
F.R.B.P. 9011(b) expressly extend to "later advocating" a "position after learning that
the position no longer has merit." *Theokary v. Abbatiello (In re Theokary),* 468 B.R. 729,
746 (Bkrtcy E.D.Pa. 2012) *aff'd,* 2013 WL 5823849 (E.D.Pa. Oct. 29, 2013) (quoting
Federal Rules Advisory Committee Note (1993)) As late as the closing afternoon of the
Dismissal hearing, in January 2014, both Benin and Tiagha vehemently insisted that the
Coquico bankruptcy filing was in good faith and not for any improper purpose. This
"advocacy" came in the wake of substantial evidence to the contrary, virtually all of
which was known to both Respondents prior even to the filing of the bankruptcy petition.
It stretches matter not at all to say that, at times, Benin's testimony was almost certainly
perjurious and Tiagha's "legal arguments" were merely an effort to perpetuate a fraud
upon the Court. In short, the Court finds the entirety of the parties' postpetition course of
conduct in connection with this misguided bankruptcy case to be "later advocacy" which
falls well within the ambit of F.R.B.P. 9011.

(ii) *Authority to Sanction Under Bankruptcy Code § 105*

Beyond the above, the Court notes an alternative source of authority through
which it can scrutinize the alleged misconduct. Section 105 of the Bankruptcy Code
gives the Court broad power to implement the provisions of the Bankruptcy Code and to
prevent abuses of the bankruptcy process, as follows:

13

### § 105. Power of court

(a) The court may issue any order, process, or judgment that
is necessary or appropriate to carry out the provisions of this
title. No provision of this title providing for the raising of an
issue by a party in interest shall be construed to preclude the
court from, sua sponte, taking any action or making any
determination necessary or appropriate to enforce or
implement court orders or rules, or to prevent an abuse of
process.

Numerous courts have resorted to Section 105(a) in the context of imposing sanctions.

*See, e.g., In re Mondelli,* 2013 WL 1187098 at *5 (D. N.J. March 21, 2013); *In re*

*Santana,* 2013 WL 1498278, at *2 (Bankr. D. N.J. April 10, 2013). The Court recognizes

that jurisprudence construing the court's inherent power to sanction cautions that it

should be reserved for those cases wherein the conduct of a party or an attorney is

egregious and no other basis for sanctions exists. The Court finds the conduct

complained of herein to be both egregious and within the ambit of F.R.B.P. 9011. To the

extent the latter conclusion fails, however, the Court concludes that its authority under

Bankruptcy Code Section 105(a) would be essentially overlapping for present purposes.

(iii)  *Sanctions Pursuant to 28 U.S.C.§ 1927*

The final basis upon which sanctions are sought is 28 U.S.C. § 1927, which

provides:

### § 1927. Counsel's liability for excessive costs

Any attorney or other person admitted to conduct cases in
any court of the United States or any Territory thereof who
so multiplies the proceedings in any case unreasonably and
vexatiously may be required by the court to satisfy
personally the excess costs, expenses, and attorneys' fees
reasonably incurred because of such conduct.

14

Benin argues that by its language § 1927 applies only to attorneys and thus is inapplicable to him. The Court agrees.

Tiagha acknowledges the section is potentially applicable to him, but argues that his conduct does not meet the applicable standard in that he did not "multiply" proceedings in the Coquico bankruptcy case, but merely filed the case and defended against the Dismissal Motion, both of which actions he believed to be reasonable.

The Third Circuit Court of Appeals has held that before a Court can order the imposition of attorney's fees under 28 U.S.C. § 1927 it must find willful bad faith on the part of the offending attorney. *Williams v. Giant Eagle Markets, Inc.,* 883 F.2d 1184, 1191 (3d Cir. 1989) The instant Motion clears this hurdle, inasmuch as the Court finds Tiagha's filing of the Coquico bankruptcy case to have been a willful act of bad faith, but as the Circuit Court has pointed out, the statutory function of sanctions under 28 U.S.C. § 1927 is more narrow than the function served via Rule 11. *Zuk v. Eastern Pennsylvania Psychiatric Inst. of the Medical College of Pa.,* 103 F.3d 294, 297 (3d Cir. 1996) "The principal purpose of imposing sanctions under 28 U.S.C. § 1927 is the deterrence of intentional and unnecessary delay in the proceedings." *Id.* The propriety of the Coquico bankruptcy filing was addressed and adjudicated in a reasonable period of time, although there was some, but not extensive, evidence of intentional and unnecessary delay. Accordingly, while this is close call, the Court concludes that sanctions under 28 U.S.C. § 1927 would not be appropriate here.

15

B.)    Sanctionable Conduct

    1)    Coquico, Inc.

As hereinbefore noted, the Debtor Corporation itself made no reply to the

Sanctions Motion, nor did it appear at the sanctions hearing through counsel. Although

Mr. Tiagha filed a response and defended, it is clear that he was doing so on his own

behalf only and not as a representative of Coquico. The allegations of misconduct, as to

Coquico, are thus unopposed. The conduct of Benin and Tiagha discussed herein will

be imputed to Coquico, as an entity can only act through individuals. The sanctions

imposed herein will therefore be assessed jointly against Coquico, for whatever that

may be worth.

    2)    Benin

The Court notes, at the outset, that with respect to the matter at hand, Benin and

Tiagha each point the finger at the other. They argue, for example:

> . . . the vast majority of the allegations in the Motion for Sanctions
> are against Mr. Tiagha and, to a lesser degree, the Debtor. There
> are few, if any, paragraphs within the Motion for Sanctions that
> apply to Malik individually. As will be fully discussed below, there
> are no grounds for this Court to impose sanctions upon Malik
> individually.

(Benin Objection to Sanctions Motion at ¶ 12)

and conversely:

> Rodriguez has piggybacked on this Court's ruling in filing his Motion
> for Sanctions against not only the Debtor, but also the Debtor's
> principal and the Debtor's counsel, Tiagha. However, notably,
> Tiagha was in no way involved in most of this conduct. Tiagha did
> not represent the Debtor with respect to the Infringement Action,
> copyrights, trademarks or license agreement, Tiagha did not and
> does not represent 18 Degrees North, and Tiagha was not involved

16

in representing the Debtor prior to the bankruptcy filing. Moreover, although Tiagha represented the Debtor in this bankruptcy, the schedules filed with this Court were prepared by Malik Benin without Tiagha's assistance. Finally, Tiagha cannot be blamed for his client's incredible testimony.

(Tiagha Memorandum of Law in Opposition to Sanctions Motion at 2)

By way of recapitulation, this Court found the filing of the Coquico Bankruptcy case to be in bad faith. In reaching this conclusion the Court emphasized that in such a setting one rarely encounters a respondent who acknowledges bad faith. That was certainly the case here, and consequently the Court, as is typical, looked for the presence or absence of various objective criteria which have been identified over time as being indicia from which the existence of bad faith may be inferred. In this respect no one factor is to be viewed as dispositive, and courts are cautioned to assess the totality of the circumstances. *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions,* 278 F.3d 175, 189 (3d Cir. 2002) The Court adhered to this, but was especially struck by the fact that almost every objective factor which courts have normally looked to in this context was present here. For example, recently in *In re EFL Partners X,* 2013 WL 4508423 (Bankr. E.D.Pa., August 23, 2013) the Court addressed a motion filed under § 1112(b) to dismiss a Chapter 11 case of a limited partnership for cause, including that the petition was filed in bad faith. In doing so, the Court considered numerous factors, as follows:

    (i)    whether the debtor has few or no unsecured creditors;
    (ii)   whether there have been previous bankruptcy filings by the debtor or related entities;
    (iii)  whether the pre-petition conduct by the debtor has been improper;
    (iv)  whether the filing permits the debtor to evade or delay court orders;

(v)     whether there are few debts to non-moving creditors;

(vi)    whether the petition was filed on the eve of foreclosure;

(vii)   whether the foreclosure property is the major asset of the debtor;

(viii)  whether the debtor has an ongoing business or employees;

(ix)    whether there is no possibility of reorganization;

(x)     whether the debtor's income is insufficient to operate;

(xi)    whether there was no pressure from non-moving creditors;

(xii)   whether the reorganization essentially involves resolution of a two-party dispute;

(xiii)  whether the corporate debtor was formed and received title to its assets immediately before the petition; and

(xiv)   whether the debtor filed solely to obtain the protection of the automatic stay.

*EFL Partners X*, 2013 WL 4508423 at *4 (citing *In re Stingfree Techs. Co.*, 427

B.R. 337, 352 (E.D.Pa. 2010) (quoting *In re SB Properties, Inc.*, 185 B.R. 198,

205 (E.D.Pa.1995)).

As this Court discussed in its bench ruling of January 13, 2014, virtually all of the above criteria were present here. To correct itself though, the Court previously stated that 13 of the above 14 factors were present, whereas it appears to be only 12. Above factor (ii) is not implicated, nor is above factor (xiii). The remainder, however, were patently obvious. What makes this case especially poignant, moreover, is the fact that over and beyond objective criteria, the sworn testimony of Benin at the Dismissal Motion hearing, and Tiagha at the Sanctions Motion hearing, confirmed what the extensive circumstantial evidence suggested.

Putting aside the issues of timeliness and the applicability of the statutory provisions which might give rise to the sanctions against him, Mr. Benin's argument, basically, is that he relied on Mr. Tiagha. There are several flaws to this theory.

18

First, Mr. Benin's own testimony from the Dismissal Motion hearing made crystal clear that it was his ultimate intention to spirit away the business and assets of Coquico in order to leave Coquico judgment proof and his plush toy business insulated from the Rodriquez judgment. No attempt to characterize this conduct and his activities as "transitioning" can obscure the stark reality of his purpose. He admitted this under oath, albeit no doubt inadvertently. In discussing the "transition" of the Coquico business to 18 Degrees North, Benin unabashedly testified that 18 Degrees North was the same business as Coquico, only "minus the debt." (N.T. 12/2/13 at pp. 98-100)

This strategy unraveled when the auction of the intellectual property assets was scheduled. Bankruptcy was the next roadblock thown up. Benin attempts to portray Tiagha as the architect of this stage of the scheme, but the evidence was clear that Benin was heavily involved in calling the shots and knew exactly what he was doing.

Ironically, Tiagha's testimony at the Sanctions Motion hearing corroborated this. Tiagha testified at the Sanctions Motion hearing, Benin did not. As will be discussed, the Court discredits much of Tiagha's testimony; not however, that portion where he describes Benin's role in orchestrating the bankruptcy case. This testimony was unrebutted and it was persuasive. The reason the Court credits the testimony is because it is so damaging to Tiagha's own interests. Tiagha's recounting of his own horrendous dereliction of duty and his complete abdication of professional responsibilities to Benin and others he

described as being the Debtor's "team," considerably strengthens the case for sanctions against Tiagha himself.

Benin's efforts to distance himself from matters thus fail. It is hard to  say exactly what Benin hoped for by way of an exit strategy. Perhaps he hoped that the bankruptcy and his mother's adversary proceeding would so muddy things up that Rodriquez would simply go away. Perhaps he thought he could buy his way out of his jam inexpensively, or maybe he had another sleight-of-hand maneuver in mind. Irrespective, any claim by Benin that he was merely an unsophisticated and duped client is absurd on this record.

The evidence established that Benin looted Coquico both prepetition and postpetition, and that he lied in multiple court filings as to Coquico's assets. Included among those court "filings" are the Bankruptcy Petition herein, and all supporting schedules and statements. He perjured himself *inter alia,* by initially denying that the filing, although prompted by something urgent which he could not recall, was in fact specifically done to stop the Marshall's sale. He subsequently recanted and acknowledged the true purpose of the case. Yet to the very end he argued that in the Chapter 7 case it was his intent to achieve an orderly liquidation of Coquico's assets. Incredibly, however, this came only after testifying that, in fact, Coquico itself had no assets, because the so called "license" rights and nominal accounts receivable that were scheduled in the case allegedly belonged by this time to 18 Degrees North.

Put differently, Benin's testimony on the financial position of Coquico, (i.e., that it was the owner of valuable intellectual property assets) was completely

inconsistent with his testimony, and the evidence proffered by him, that Coquico had for years held only a license, and that this license, in fact, was terminated years before when 18 Degrees North became the exclusive licensee. Adopting such utterly irreconcilable versions of one set of facts, during the course of a single hearing, is compelling evidence of bad faith. Hence, sanctions against Benin under F.R.B.P. 9011 are warranted for willful bad faith in the bankruptcy filing, the later advocacy of positions shown to be without merit, and for the giving of false testimony.

3.    <u>Tiagha</u>

Tiagha argues that he "was in no way involved" in the foregoing misconduct and that any sanctions against him under the circumstances are therefore unwarranted. (Tiagha Response to Sanctions Motion at 2 – 3) This is not true. Tiagha was certainly involved in the Bankruptcy planning and filing. He knew prior to the bankruptcy filing of Benin's complete reversal on the issue of the ownership of the intellectual property assets. Indeed, he ghostwrote the pleadings that were purportedly filed *pro se* with the District Court in Puerto Rico on that very point.

The Court discredits all of Tiagha's sworn testimony to the effect that he had essentially nothing to do with the Puerto Rican infringement litigation beyond providing friendly advice. This is inconsistent with Tiagha's own marketing materials:

> **Copyright Infringement Litigation**
>
> Our litigation department provided strategic advice to a local plush toy manufacturer with a trademark and

> copyright infringement case in Federal Court in Puerto
> Rico which resulted in victory for the client. We
> continue to advise client on its intellectual property
> consolidation strategy to increase value of portfolio in
> light of strategic growth plans.

(Dismissal Motion hearing Ex. R-40)

At the Sanctions Motion hearing Tiagha attempted to explain this away as just a little "hyperbole" (N.T. 2/26/14, at p.15 at ln 12); however the Court rejects this as a post-hoc stratagem.

Ironically, Tiagha's main defense is his own alleged inexperience. He testified that he had never handled any other bankruptcy case and that he took this case on, reluctantly, and *pro bono*, for his friend Benin who could not afford other counsel. This may, in fact, be true, but it in no way excuses Tiagha's conduct. The Bankruptcy Petition was filed under his name, as were many other schedules, statements and pleadings. Incredibly, Tiagha freely admits that he did not even review critical documents filed in this case under his name, for example:

> Q.  Okay. Now did you review the bankruptcy schedules and
> statements before they were filed?
>
> A.  No.
>
> Q.  No? You would agree with me that they were electronically filed
> under your name, correct?
>
> A.  That's correct, yes.
>
> Q.  Did you do anything to determine what needed to be contained
> within the bankruptcy schedules and statements?
>
> A.  So I looked over what the blank forms of the schedules and the
> statements of financial analysis, but in terms of determining
> whether what we submitted was accurate, I did not do that, no.

22

Q. Did you do anything to figure out whether -- or did you research whether you had any duties or responsibilities to make sure that that information was true and correct?

A. I did not do any research, but -- no, I did not do any research.

Q. Okay. Did you take any steps to amend the bankruptcy schedules or the statement of financial affairs after the creditor's meeting in August?

A. No.

(N.T. 2/26/14 at p. 38)

There was substantial additional testimony by Tiagha to the same basic effect. He explicitly testified for instance, that he didn't know what was in the schedules filed with the Court, and that even if he had reviewed them closely he would not have known if what should have been in them was there. The Courts finds this disingenuous. Bankruptcy forms are routinely completed with accuracy by lay persons. While some questions are complicated, many are exceedingly straightforward, and none should have been beyond the ken of someone with Tiagha's experience.    Astonishingly, even after a lengthy colloquy concerning the bankruptcy schedules on December 2, 2013, the first day of the Dismissal Motion hearing, Tiagha proceeded to file "amended" schedules under his name, yet once again neither he, nor anyone in his office, even looked at them. (N.T. 2/26/14 at p. 57)

Tiagha has been a licensed attorney in the Commonwealth of Pennsylvania since the year 2000.  Before opening his own office he practiced law at several well known Philadelphia firms. He considers himself to be an experienced corporate attorney and acknowledged at the sanctions hearing his understanding that when an attorney takes a matter on, the matter becomes the attorney's responsibility. (N.T. 2/26/14 at pp. 47-51)

23

Tiagha insists his conduct should be excused, because he knew basically nothing about bankruptcy, and because he relied on Benin, Benin's wife, and Benin's accountant for anything substantive. Distressingly, Tiagha's counsel suggests that this failing is actually a virtue. Arguing on Tiagha's behalf, counsel writes, "the bankruptcy schedules were prepared by Benin on behalf of the Debtor and without Tiagha's assistance." (Tiagha's Memorandum of Law at 4) This position has no merit. Indeed, the Court rejects the entirety of this line of thinking. It is almost incomprehensible that Tiagha, an experienced corporate attorney, could reasonably purport to advocate that the Coquico bankruptcy filing was in good faith at the Dismissal Motion Hearing, when he never even looked at the papers filed in support of it, did not know their contents, and did virtually nothing to assure himself of their accuracy. On this score, for example, Tiagha testified with respect to the Amended Bankruptcy Schedules filed on January 9, 2014, as follows:

> Q. So you -- well, you didn't answer my question actually. My question was did you look at the amended schedule before your office filed it?
>
> A. I did not. I personally was not in town. I was down in Virginia, but someone from my office just filed them without looking because Malik represented to me that Ken Aaron had taken a look at them. I was comfortable with the fact that they were accurate.

N.T. 2/26/14 at p. 80

Mr. Tiagha is too easily comforted. Mr. Aaron was the attorney who went on to file the adversary proceeding against Rodriguez and the Chapter 7 Trustee over the ownership of the intellectual property assets. This would make him arguably the last attorney whose review of the schedules Tiagha should have placed unfettered reliance

24

upon, assuming hearsay twice removed could ever constitute a "reasonable inquiry" for

purposes of Rule 9011, which the Court highly doubts.

Further to this point, it should be noted that a bankruptcy court need not find

"bad faith" or a nefarious intent in order to conclude that Rule 9011 representations

were breached. *See, e.g., Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.,*

498 U.S. 533, 549, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991); *Fellheimer, Eichen &*

*Braverman, P.C. v. Charter Technologies, Inc.,* 57 F.3d 1215, 1225 (3d Cir.1995);

*Jones v. Pittsburgh Nat'l Corp.,* 899 F.2d 1350, 1358 (3d Cir.1990); *In re Kouterick,*

167 B.R. 353, 363 (Bankr.D.N.J.1994). The "pure-heart- and-empty-head" defense

is not available to anyone faced with Rule 9011 sanctions. *In re Rivera,* 342 B.R.

435, 460 (Bkrtcy.D.N.J.2006); *See, e.g., Gaiardo v. Ethyl Corp.,*835 F.2d 479, 482

(3d Cir.1987); *In re Young,* 497 B.R. 927, 928 (Bkrtcy. W.D.Ark. 2013); reversed on

other grounds 2014 WL 944846 (8th Cir. BAP, March 12, 2014) *In re Robinson,* 373

B.R. 612, 625 (Bkrtcy.E.D.Ark. 2007); *In re Flowers,* 2012 WL 987298, at *7

(Bkrtcy.E.D.N.Y. March 2, 2012); *In re KTMA Acquisition Corp.,* 153 B.R. 238, 248

(Bkrtcy.D.Minn. 1993); *In re Buchanan,* 1990 WL 241937, at *14 (Bkrtcy.N.D.Ohio,

Dec. 5, 1990); William W. Schwarzer, *Sanctions Under the New Federal Rule 11—A*

*Closer Look,* 104 F.R.D. 181, 187 (1985)

Tiagha's alleged reliance on Benin and others was not wrong *per se.* As the

Third Circuit has observed:

> An attorney certainly "is not always foreclosed from relying
> on information from other persons." *Garr,* 22 F.3d at 1278. In
> making statements to the court, lawyers constantly and
> appropriately rely on information provided by their clients,
> especially when the facts are contained in a client's
> computerized records. It is difficult to imagine how attorneys
> might function were they required to conduct an independent
> investigation of every factual representation made by a client
> before it could be included in a court filing. While Rule 9011

> "does not recognize a 'pure heart and empty head' defense,"
> *In re Cendant Corp. Derivative Action Litig.,* 96 F.Supp.2d
> 403, 405 (D.N.J.2000), a lawyer need not routinely assume
> the duplicity or gross incompetence of her client in order to
> meet the requirements of Rule 9011. It is therefore usually
> reasonable for a lawyer to rely on information provided by a
> client, especially where that information is superficially
> plausible and the client provides its own records which
> appear to confirm the information.

*In re Taylor,* 655 F.3d 274, 284 (3d Cir. 2011)

Tiagha, however, clearly went too far. As noted, Tiagha looked at nothing. His

inquiries were not just simply unreasonable:  if he is to be believed, then his inquiries

were virtually non-existent.

As with Benin, Tiagha's testimony was at times all over. He readily

acknowledged that the bankruptcy filing was not done to benefit creditors:

> Q.  Did you consider whether filing a Chapter 7 would be in the best
> interest of the creditors?
>
> A.  No, that was not an active consideration frankly.

N.T. 2/26/14 at 64

Tiagha, just as Benin, also argued however that the bankruptcy was filed to

ensure an orderly liquidation of assets for the benefit of creditors. Yet Tiagha, just as

Benin, knew throughout the course of the case that Coquico was claiming to own no

assets because of their earlier "transition"  to 18 Degrees North.

The Court finds sanctions to be warranted against Tiagha under F.R.B.P. 9011

because his conduct in this case from start to finish was objectively unreasonable. In

this regard, the Court notes that the term "reasonable" has been defined as "an

objective knowledge or belief at the time of filing of a challenged paper that the claim

26

was well-grounded in law and fact." *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 289 (3d Cir. 1991)  In determining reasonableness courts have looked to various objective factors, such as "the amount of time available to the signer for conducting the factual and legal investigation; the necessity for reliance on a client for the underlying factual information; the plausibility of the legal position advocated . . . whether the case was referred to the signer by another member of the bar. . . . ; and the complexity of the legal and factual issues implicated." *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 95 (3d Cir. 1988) citing F.R.C.P. 11 Advisory Committee Note and *Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 875 (5th Cir. 1988) As with "bad faith," no one factor is dispositve and courts are cautioned to consider the reasonableness of counsel's inquiry under all the material circumstances. *In re Taylor,* 655 F.3d at 284.

The Court finds Tiagha's conduct to fall short on all counts, inasmuch as by his own admission he made no inquiries, did no research, abdicated his responsibilities, and advanced implausible arguments over uncomplicated questions of law and fact. He actually appears to have gone out of his way to avoid any attempt to perform his duties; no doubt because he possessed the same guilty knowledge of the improper purpose of the bankruptcy as did Benin.  At the risk of repetition, that an attorney with 13 years' experience could vigorously advocate in open Court the propriety of papers he never even looked at is mystifying.[7]

C.)    <u>Appropriate Sanctions</u>

A sanction imposed for violation of F.R.B.P. 9011 must be limited to what is sufficient to deter repetition of such conduct or comparable conduct on the part of others

---

[7] In his summation, on January 13, 2014, Tiagha categorically stated that the very notion that this bankruptcy was filed in bad faith was "absolutely absurd." Audio transcript of hearing, 3:31 p.m.

similarly situated. The sanction is not meant to reward the wronged party, rather it is meant to accomplish the twin goals of specific and general deterrence. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 404, 110 S.Ct. 2447, 2460 (1990) As hereinbefore noted, however, monetary sanctions in the form of an order to pay all or part of an injured party's counsel fees and expenses can be an acceptable means by which to accomplish the goals of F.R.B.P. 9011. The Court finds that to be the case here.

It is clear that Benin and Tiagha together were intent on abusing the legal system to whatever extent was necessary to avoid losing the intellectual property assets. This can be seen in their last minute about face in Puerto Rico as to the ownership of the assets, the bankruptcy filing here after the Puerto Rico District Court rejected their argument and allowed the public auction to proceed, the degree of misconduct in the bankruptcy as detailed herein, and the Respondent's obdurate insistence that each individually did nothing wrong.

The Court is convinced that a significant monetary sanction is required to impress upon Benin and Tiagha that this type of outrageous conduct will not be tolerated, and to send the same message to others who may be similarly situated.

The Court has carefully reviewed the legal bills admitted at the Sanctions Motion hearing. At the outset, the Court rejects the proposition that the entirety of the charges of Rodriguez's Puerto Rico counsel should be disallowed, because Philadelphia counsel could have handled the entire matter. While that may be so, the Philadelphia costs would no doubt have risen as the Puerto Rico costs declined. The hourly rates charged are reasonable, as are the vast majority of the time charges. The overall total does appear high, in the abstract, but not nearly so much when one pauses to consider the

contentiousness of the matter and the vigorous, albeit meritless, defense interposed by Benin and Tiagha. It is hardly an overstatement to say that the Respondents bear the blame for much of the expense.

Taking these factors into consideration, the Court considers it appropriate to order the payment of counsel fees, but to reduce the requested amount by 33⅓%. The accompanying Order will thus impose sanctions, jointly and severally, on the Respondents, in the aggregate sum of $56,066.91. The Court believes this amount to be consistent with that which is necessary to achieve the twin goals of F.R.B.P. 9011, while at the same time giving due regard to the claim that the charges are high, as well as the principle that a sanction should not be imposed so as to reward the movant.

In reaching its determination the Court acknowledges that the filing of the Bankruptcy Petition is a discrete sanctionable act, but reiterates that the balance of this case consisted entirely of Benin and Tiagha's "later advocacy" of the filing, which is itself separate sanctionable conduct. The Court likewise rejects the Respondents' mutual request that any sanction imposed be nominal, inasmuch as this case was, as Tiagha's counsel insists, just "a minor Chapter 7 proceeding . . ." for which his client, Tiagha, has already been punished enough. The Court disagrees with this characterization and declines this invitation.

The Court is convinced that any lesser sanction than that imposed herein will fail to convince the Respondents of the impropriety of their actions, or dissuade their future misconduct. The Court similarly concludes that the sanction imposed is necessary to send a proper message to third parties to the same effect.[8]

---

[8] For purposes of clarity, the Court emphasizes that the sanction imposed upon the Respondents herein is based in the first instance upon violation of F.R.B.P. 9011. To the extent, however, that F.R.B.P. 9011

An appropriate Order follows.

By the Court:

_____
Stephen Raslavich
U.S. Bankruptcy Judge

Dated: <u>April 2, 2014</u>

---

were for any reason shown to be unavailing the Court, in the exercise of its discretion, would impose the same monetary sanction under 11 U.S.C. § 105(a), it having found the conduct complained of to be both wilful and egregious, and the sanction it has imposed herein to be appropriate in view of this conduct and the Respondents' abuse of process.